Botanisol Holdings II, LLC v. Propheter, 2021 NCBC 68.

STATE OF NORTH CAROLINA

HALIFAX COUNTY

BOTANISOL HOLDINGS II, LLC,

Plaintiff,

v.

SCOTT PROPHETER; DAVID
MAYER; and CRITICALITY, LLC,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21 CVS 102

**ORDER AND OPINION ON
DEFENDANTS' MOTIONS TO
DISMISS**

1.     This dispute pertains to the ownership of a CBD processing business that developed from an idea originating with childhood friends David Talenfeld and Scott Propheter.  It is before the Court on each Defendant's Motion to Dismiss. (ECF No. 8, Motion to Dismiss of Criticality, LLC, "Criticality Motion"; ECF No. 18, Motion to Dismiss of Scott Propheter, "Propheter Motion"; and ECF No. 16, Motion to Dismiss of David Mayer, "Mayer Motion", collectively "the Motions".)  For the reasons stated below, the Court concludes that the Criticality Motion should be **GRANTED**, the Mayer Motion should be **GRANTED,** and the Propheter Motion should be **GRANTED** in part and **DENIED** in part.

> *Stubbs & Perdue, P.A., by Laurie B. Biggs, Trawick H. Stubbs, Jr., and Jimmie Banks Hicks for Plaintiff Botanisol Holdings II, LLC.*
>
> *Hornthal, Riley, Ellis & Maland, LLP, by L. Phillip Hornthal III and Andrew W. Howle, for Defendants Scott Propheter and David Mayer.*
>
> *Poyner Spruill LLP, by John Michael Durnovich, Andrew H. Erteschik, David W. Long, and Colin R. McGrath, for Defendant Criticality, LLC.*

Earp, Judge.

## I. BACKGROUND

2. The Court does not make findings of fact when ruling on a motion to dismiss under Rule 12(b)(6). *See, e.g., Concrete Serv. Corp. v. Inv'rs. Grp., Inc.,* 79 N.C. App 678, 681 (1986). Rather, the Court tests the claims by stating the relevant factual allegations in the Complaint construed in Plaintiff's favor without being bound to any of its alleged legal conclusions.

3. Botanisol Holdings II, LLC, ("Plaintiff") is an Arizona limited liability company organized by David Talenfeld ("Talenfeld"). (Compl. ¶¶ 1, 8.) It is one of a family of pharmaceutical companies under the Botanisol name. (Compl. ¶¶ 13, 30 n.1, Ex. G, ECF No. 3.)[1]

4. Defendant Propheter ("Propheter") is a childhood friend of Talenfeld. (Compl. ¶ 11.) Propheter and his father-in-law, Defendant Mayer ("Mayer"), are North Carolina farmers. (Compl. ¶ 15.)

5. In 2016, Propheter met Talenfeld in Arizona to discuss starting a business involving the extraction of CBD oil from hemp to use in a variety of applications. (Compl. ¶ 12.) Propheter and Mayer had access to farmland in North Carolina to grow the hemp, and the parties envisioned that the processing plant would be located in North Carolina. (Compl. ¶¶ 14–15.)

---

[1] The Complaint alleges that Botanisol Holdings LLC and Botanisol LLC were formed in 2011 and 2013, respectively, and Botanisol Holdings II, LLC was formed sometime prior to 3 May 2017 as a result of the restructuring of Botanisol Holdings LLC. (Compl. ¶¶ 8–9, 30 n.1.) The Court uses "Botanisol" to refer to the Plaintiff, Botanisol Holdings II, LLC.

6. Because the operation was to take place in North Carolina, Talenfeld and Propheter agreed that Propheter would be in charge of the day-to-day operations. (Compl. ¶ 16).

7. On 3 May 2017 Articles of Organization were filed in Arizona to establish a limited liability company, Criticality, LLC ("Criticality Arizona") for the business. (Compl. ¶ 29, Ex. F.) There were three members of Criticality Arizona: Propheter, who owned 33%; Mayer, who owned 33%; and Plaintiff, which owned 34% and through which Talenfeld held his interest. (Compl. ¶¶ 17, 30–31). No written operating agreement was executed by the members at the time the LLC was organized. (Compl. ¶ 33.) Talenfeld was the initial manager. (Compl. ¶ 32.)

8. Even before the Articles of Organization had been filed, Propheter, Mayer, and Talenfeld made a concerted effort to get the operations of Criticality Arizona up and running. (Compl. ¶¶ 18–28.) Using a business plan produced in 2016 by Botanisol Holdings, (Compl. Ex. A), Propheter solicited contributions from local farmers to fund start-up costs, (Compl. ¶¶ 18–21). Meanwhile, Talenfeld filed an application for a trademark with the United States Patent and Trademark Office, and both Propheter and Talenfeld began conducting research for their business. (Compl. ¶ 22–23).

9. Talenfeld and Propheter also began discussions with Thar Process Technologies ("Thar") about a joint venture in which Thar would provide the equipment for a processing plant and Criticality Arizona would provide the hemp and run the plant. (Compl. ¶ 24.) Talenfeld included reference to Thar in the written

business plan for Criticality Arizona. (Compl. ¶¶ 25-26, Ex. C.) Both Talenfeld and Propheter made public statements about their intention to build a production facility in Hobgood, North Carolina. (Compl. ¶ 28, Ex. E.)

10. Plaintiff's understanding was that Criticality Arizona and Thar would each own 50% of a newly created entity to be named TCP, NC, LLC, ("TCP"). (Compl. ¶¶ 38–39.) TCP was an abbreviation for "Thar Criticality Partnership." (Compl. ¶ 39.) Plaintiff, through Talenfeld, publicized its understanding in this regard to investors. (Compl. ¶¶ 34–36, Exs. G–H.)

11. Among other things, Talenfeld delegated the job of negotiating with Thar to Propheter, who provided updates to Talenfeld about the status of the negotiations through the summer of 2017. (Compl. ¶¶ 37, 41).

12. In June 2017, Propheter sent Talenfeld a draft operating agreement for a North Carolina limited liability company also named "Criticality" ("Criticality North Carolina"). (Compl. ¶ 38, Ex. I.) The draft reflected that the proposed members of Criticality North Carolina were TCP PA LLC[2], which was to hold an 80% interest, and Criticality Arizona, which was to hold a 20% interest. (Compl. Ex. I.) Plaintiff was not told whether this operating agreement was ever finalized. (Compl. ¶ 40.)

13. Despite sending Talenfeld the draft operating agreement, Propheter continued to represent to Plaintiff that, as had been discussed, the entity that Thar and Criticality Arizona were working to create would be called TCP NC, LLC and

---

[2] This entity is also named "TCA PA LLC" in at least one part of the draft agreement.

that it would be owned 50% by Thar and 50% by Criticality Arizona. (Compl. ¶¶ 39, 42.)

14.     Thereafter, without Plaintiff's knowledge, on 2 June 2017 Propheter filed Articles of Organization for the new North Carolina limited liability company, also named Criticality, LLC. (Compl. ¶ 46.)   Plaintiff alleges that Propheter deliberately did not clarify which "Criticality" was involved in the joint venture with Thar.  (Compl. ¶ 47.)[3]

15.     Throughout 2017, Propheter posted on social media using Criticality Arizona's logo and trademark.  (Compl. ¶ 43.)  He also posted photos of himself in which he wore a shirt with Criticality Arizona's name and logo.  (Compl. ¶ 43.) Talenfeld authorized the use of the trademark and logo because he assumed it was being used in furtherance of the joint venture in which Criticality Arizona would be a 50/50 owner.   (Compl. ¶ 43.)

16.     TCP was formed on 29 November 2017.  (Compl. ¶ 50.)   However, Propheter misrepresented the ownership of TCP to Plaintiff.  (Compl. ¶ 51.)  Instead of Thar and Criticality Arizona each owning 50% of TCP, Thar owned 80%[4], another

---

[3] The ownership of Criticality North Carolina is not alleged.

[4] In contrast to paragraph 60 of the Complaint, Exhibit N to the Complaint states that TCP PA, LLC, an affiliate of Thar Technology, owned 88% of TCP.

entity, Pocosin Holdings, LLC, owned 3%,[5] and the balance (17%) was owned by Criticality Arizona. (Compl. ¶¶ 60–61.)[6]

17. On 18 December 2017 Propheter arranged for the sale of a 40% interest in Criticality North Carolina to Pure AG, LLC, for a purchase price of $10,000,000. (Compl. ¶ 52.) Plaintiff was not aware of the sale until later, and it did not receive a distribution from the sale. (Compl. ¶¶ 52–54.)

18. In March 2018, after trying unsuccessfully to get an update from Propheter for several months, Talenfeld traveled to North Carolina to meet with Propheter. (Compl. ¶ 54.) During this meeting Propheter described the ownership structure of TCP. (Compl. ¶ 56.) Talenfeld prepared a "Short Form Operating Agreement," in which he "described the sequence of ownership" as it was related to him by Propheter. (Compl. ¶ 56, Ex. N.)

19. With respect to the ownership of TCP, the "Short Form Operating Agreement" states that Criticality Arizona owned a 9% interest; TCP PA, LLC, an affiliate of Thar, owned an 88% interest; and Pocosin Holdings, LLC owned the remaining 3%. (Compl. Ex. N.) The document purports to bear the signature of Talenfeld dated 8 March 2018 on a signature line just below the word "AFFIRMED" printed in all capital letters. (Compl. Ex. N.)

---

[5] Pocosin Holdings, LLC is alleged upon information and belief to have been formed by Propheter as its sole member. (Compl. ¶¶ 62–63.)

[6] Plaintiff alleges that it owned 90,000 units of TCP, which in turned owned 1,000,000 units of Criticality North Carolina, "which equated to an ownership percentage of 34% of the actual manufacturing plant and its operations." (Compl. ¶ 58.) Regardless of the actual percentage owned by the parties, Plaintiff alleges that Criticality Arizona did not own 50% of TCP.

20.     Prior to Talenfeld's receipt of this explanation from Propheter, Plaintiff was not aware that the terms of the joint venture between Criticality Arizona and Thar had been modified from the planned 50/50 ownership, and it had not agreed that Propheter, through Pocosin Holdings, LLC, could take a separate ownership interest that would dilute Criticality Arizona's interest in TCP. (Compl. ¶¶ 60, 64.)

21.     The "Short Form Operating Agreement" also states that TCP owned 60% of Criticality North Carolina. (Compl. Ex. N.) Therefore, Plaintiff, through its ownership interest in Criticality Arizona, which had an ownership interest in TCP, also had an interest in Criticality North Carolina. (Compl. Ex. N.)

22.     The "Short Form Operating Agreement" provides that "[t]hese ownership interests in Criticality, LLC North Carolina are subject to proportional dilution in the event of additional financing, which will be determined at the sole discretion of Mr. Propheter and the other management of that entity, as will the timing of ownership-proportional profits distributions or distribution of proceeds upon liquidation. Mr. Propheter will notify Criticality, LLC Arizona in writing regarding any such event . . . ." (Compl. ¶ 59, Ex. N.)

23.     On 22 April 2020 Pyxus International, Inc. acquired 60% of the equity of Criticality North Carolina. (Compl. ¶ 65.)

24.     Plaintiff was not notified of the sale until May 2020, when Propheter "purported to bring [Plaintiff] a certified check for Plaintiff's 'share' of the sale proceeds . . . ." (Compl. ¶¶ 66–67.) Despite Plaintiff's request, Propheter refused to provide any information about the sale, the actual sale price, the terms of the sale or

the distribution of the sale proceeds. (Compl. ¶ 69.) In response to concern that Criticality Arizona investors would be disappointed in this "cash out," Propheter responded that the cannabis market had "tanked." (Compl. ¶¶ 70–72.) Propheter has continued to refuse to provide further information about the sale or to account for the sales proceeds. (Compl. ¶¶ 73–75.)

25. Plaintiff brought this suit in February 2021, including claims against Propheter for breach of fiduciary duty, conversion, fraud, negligent misrepresentation, and unfair and deceptive trade practices in violation of Chapter 75 of the North Carolina General Statutes, as well as for an accounting and for the imposition of a constructive trust. Plaintiff joins Mayer in the claims for conversion, negligent misrepresentation, and violation of Chapter 75, as well as in its requests for equitable relief. Plaintiff joins Criticality North Carolina in its claims for conversion, violation of Chapter 75, and its requests for equitable relief. All three Defendants have moved to dismiss. The Motions were fully briefed, and the Court held a hearing on the Motions on 26 August 2021. All parties were present and were heard. The Motions are now ripe for disposition.

## II. ANALYSIS

### A. Legal Standard

26. When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under

some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank*, 85 N.C. App. 669, 670 (1987) (citation omitted).

27. The Court must construe the complaint liberally and accept all well-pleaded allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577 (2009). The Court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274 (2005) (citation and quotation marks omitted). "It is well-established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.' " *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (quoting *Wood v. Guilford Cty.*, 355 N.C. 161, 166 (2002)).

28. As for any documents attached to or referenced in the Complaint, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers" without converting a Rule 12(b)(6) motion into a motion for summary judgment. *Weaver v. St. Joseph of the Pines, Inc.*, 187 N.C. App. 198, 204 (2007) (quoting *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001)); *see also Schlieper v. Johnson,* 195 N.C. App. 257, 261 (2009) ("When documents are attached to and incorporated into a complaint, they become part of the complaint and may be considered in connection with a Rule

12(b)(6) motion without converting it into a motion for summary judgment.") (citation omitted).

B.    Breach of Fiduciary Duty Claim Against Propheter

29.    Plaintiff's First Cause of Action, Breach of Fiduciary Duty, is brought solely against Propheter.  Plaintiff contends that Propheter, as a member and the operations manager of Criticality Arizona,[7] owed both Criticality Arizona and Plaintiff, as a member of Criticality Arizona, fiduciary duties in accordance with Arizona's Limited Liability Company Act (the "Arizona LLC Act").  (Compl. ¶ 77.) Plaintiff cites to Ariz. Rev. Stat. §§ 29-601 *et seq.* to support this contention.[8]  (Compl. ¶ 77.)

30.    However, the Arizona LLC Act does not impose fiduciary duties on fellow members of LLCs.  *In re Sky Harbor Hotel Props., LLC,* 246 Ariz. 531, 532–33 (2019) (stating "[t]he [Arizona] LLC Act does not expressly impose any fiduciary duties on members . . . "); *see* Ariz. Rev. Stat. §§ 29-601 *et seq.* (LexisNexis 2018). "[U]nlike both corporations and partnerships, LLC members do not owe each other

---

[7] The Complaint specifies that Talenfeld was the LLC's named manager, not Propheter. (Compl. ¶ 32.)

[8] Although the Arizona LLC Act was repealed effective 1 September 2020, the historical notes to the new Arizona Limited Liability Company Act (the "New LLC Act") provide that "[w]ith respect to a limited liability company formed before September 1, 2019, the rights and obligations of the company's members and managers relating to matters arising and events occurring before  September 1, 2020, based on events and activities occurring before September  1, 2020, shall be determined according to the law and terms of the operating agreement in effect at the time of the matters and events."  Ariz. Rev. Stat. § 29-3304 (LexisNexis 2019).  Here, all of the alleged events in the Complaint occurred prior to 1 September 2020, so the New LLC Act does not apply.  Instead, the law that was in place prior to 1 September 2020 controls.

fiduciary duties unless they are expressly included in the LLC operating agreement." *In re Sky Harbor Hotel Props., LLC,* 246 Ariz. at 533 (citing *Butler Law Firm, PLC v. Higgins,* 243 Ariz. 456, 462 (2018)). Therefore, absent a specific provision in Criticality Arizona's operating agreement—which is not alleged—the default rule is that no member-to-member fiduciary duties exist. *TM2008 Invs., Inc. v. ProCon Capital Corp.,* 234 Ariz. 421, 424–25 (2014).

31. Nor does Arizona law hold that an operations manager owes fiduciary duties to members of the LLC. Rather, the agent's duty is to its principal, the LLC itself. *McCallister Co. v. Kastella*, 170 Ariz. 455, 457 (1992).

32. Plaintiff also contends that Propheter owed both a duty of loyalty, care, and good faith, as well as a covenant of good faith and fair dealing to Criticality Arizona. (Compl. ¶¶ 77–78.) However, Plaintiff has not attempted to bring a derivative action on behalf of Criticality Arizona. Consequently, these allegations serve no purpose.

33. For these reasons, the Court **GRANTS** Propheter's Motion to Dismiss with respect to Plaintiff's First Claim for Relief.

C.     Conversion of Corporate Assets Claim and Opportunities
Against All Defendants

34. In Plaintiff's Second Claim for Relief, Conversion of Corporate Assets and Opportunities, Plaintiff contends that Defendants "unlawfully misappropriated and diverted assets and business opportunities to [Criticality North Carolina] that properly belonged to [Criticality Arizona]." (Compl. ¶ 87.) Each Defendant argues that this claim should be dismissed because it is not cognizable under North Carolina

law. Specifically, they argue that the tort of conversion in this State applies only when goods and tangible personal property are at issue. (Def. Criticality's Mem. Supp. Mot. Dismiss 7, ECF No. 9; Def. Mayer's Mem. Supp. Mot. Dismiss 6, ECF No. 17; Def. Propheter's Mem. Supp. Mot. Dismiss 8, ECF No. 19.) The Court agrees.

35. "In North Carolina, only goods and personal property are properly the subjects of a claim for conversion." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 414 (2000) ("intangible interests such as business opportunities and expectancy interests [are not] subject to a conversion claim") (citation omitted); *see also Global Textile All., Inc. v. TDI Worldwide, LLC,* 2018 NCBC LEXIS 159, at *33–34 (N.C. Super. Ct. Nov. 29, 2018) (dismissing plaintiff's claim for conversion because it was based on intangible information and failed to allege a deprivation of use or access to such information); *Window World of N. Atlanta, Inc. v. Window World, Inc.,* 2018 NCBC LEXIS 111, at *8–9 (N.C. Super. Ct. Oct. 22, 2018) ("an intangible interest cannot provide the basis for a conversion claim"); *Horne Heating & Air Conditioning Co. v. Horne,* 2017 NCBC LEXIS 96, at *9 (N.C. Super. Ct. Oct. 11, 2017) ("North Carolina law is clear that 'intangible interests such as business opportunities and expectancy interests' are not subject to a conversion claim.") (quoting *Norman,* 140 N.C. App. at 414).

36. Here, Plaintiff contends that Defendants, through the creation of Criticality North Carolina, "diverted corporate assets and opportunities from [Criticality Arizona], *by* diluting its ownership interest in [TCP], and deviating from the agreed upon terms whereby [Criticality Arizona] would be a 50% owner in the

hemp processing plant venture." (Compl. ¶89) (emphasis added). Although Plaintiff begins the sentence by stating that Defendants diverted corporate *assets*, which could imply tangible assets, Plaintiff then modifies the sentence with the adverbial phrase, "by diluting its ownership interest in TCP, and deviating from the agreed upon [ownership] . . . " making clear that the "assets" referenced are not tangible at all but rather are business opportunities and expectancy interests. Likewise, the allegation in paragraph 90 that "[b]y establishing [Criticality North Carolina] . . . Defendants diverted corporate profits" is again a reference to loss of a business opportunity or expectancy interest. (Compl. ¶¶ 89–90.)[9]

37. Accordingly, the Court **GRANTS** each Defendant's Motion to Dismiss Plaintiff's Second Claim for Relief.

### D.   Conversion Claim Against Propheter and Mayer

38. Plaintiff's Third Claim for Relief, Conversion, alleged only against Propheter and Mayer, appears to restate the same allegations attempted in its Second Claim for Relief: "[B]y diluting of the [Criticality Arizona's interest in TCP] to the detriment of Plaintiff and not properly accounting for the sales proceeds from the

---

[9] In its opposition brief, Botanisol asserts that it has alleged that Criticality North Carolina exercised ownership over Botanisol's sales proceeds from the sale of Criticality North Carolina. However, the paragraphs of the Complaint it references (Compl. ¶¶ 53, 56–59) do not contain this allegation. Instead, Botanisol alleges more broadly that it did not receive any distribution as a result of the sale (Compl. ¶ 53), and that Mr. Talenfeld later learned that a second "Criticality" existed, (Compl. ¶¶ 56–58). Nowhere is there an allegation that any defendant converted a specific amount of the sales proceeds that should have gone to Botanisol. *See Progress Point One-B Condo. Ass'n, Inc. v. Progress Point One Prop. Owners Ass'n, Inc.*, 2015 NCBC LEXIS 22, at *8 (N.C. Super. Ct. Mar. 2, 2015) (requiring identification of "a specific sum . . . that is subject to the alleged conversion" and dismissing a nonspecific claim).

sale of the ownership interest, [Propheter and Mayer] have converted assets that would otherwise belong to the Plaintiff." (Compl. ¶ 96.) Plaintiff does not contend that Plaintiff owned 50% and was not paid for 50%; Plaintiff contends that it lost the opportunity to own 50% and, therefore, lost the entitlement to more of the sales proceeds. This claim, like Plaintiff's claim for conversion of assets, is an attempted claim for conversion of an intangible interest that is not recognized in North Carolina law.

39. For these reasons, the Court **GRANTS** both Propheter and Mayer's Motions to Dismiss Plaintiff's Third Claim for Relief.

E. Fraudulent Misrepresentation and Fraud Claims Against Propheter

40. Plaintiff's Fourth and Sixth Claims for Relief against Propheter are for fraudulent misrepresentation and fraud, respectively. Propheter argues that these claims are one and the same under North Carolina law. (Def. Propheter's Mem. Supp. Mot. Dismiss 9–10.) The Court agrees. Regardless of whether it is labeled "fraud" or "fraudulent misrepresentation," the elements of the claim are the same under North Carolina law. *See Taylor v. Gore,* 161 N.C. App. 300, 303 (2003); *RD&J Props. v. Lauralea-Dilton Enters., LLC*, 165 N.C. App. 737, 744 (2004).

41. The essential elements of fraud are: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Terry v. Terry,* 302 N.C. 77, 83 (1981) (citation omitted). Additionally,

Plaintiff's reliance on any misrepresentations must be reasonable. *State Properties, LLC v. Ray*, 155 N.C. App. 65, 72 (2002).

42. There is an additional requirement. Rule 9 of the of the North Carolina Rules of Civil Procedure ("Rule 9") requires that fraud be pleaded with particularity. N.C.G.S. § 1A-1 Rule 9(b). "A pleader meets the requirements of [Rule 9] when its fraud claim alleges the 'time, place, and content of the fraudulent representation, identity of the person making the representation, and what was obtained as a result of the fraudulent acts or representations.' " *Lawrence v. UMLIC-Five Corp.,* 2007 NCBC LEXIS 20, at *31 (N.C. Super. Ct. June 18, 2007) (citing *Bob Timberlake Collection, Inc. v. Edwards,* 176 N.C. App. 33, 39 (2006)).

43. Propheter argues that Plaintiff's claim should be dismissed because Plaintiff admits in its Complaint that it was aware of the creation of Criticality North Carolina by virtue of Talenfeld's signature on behalf of Botanisol "affirming" the structure on the "Short Form Operating Agreement." (Compl. ¶ 56, Ex. N.) Once aware, Propheter argues, Botanisol cannot establish the elements of scienter and reasonable reliance. (Def. Propheter's Mem. Supp. Mot. Dismiss 11.)

44. Plaintiff alleges that Propheter had a duty to provide truthful information, that he both affirmatively misrepresented and concealed material facts, that he did so deliberately to deceive Plaintiff knowing that the statements he made were false or incomplete, that Plaintiff reasonably relied on Propheter's misrepresentations and was deceived, and that as a direct and proximate cause of Propheter's false representations, Plaintiff suffered damages. (Compl. ¶¶ 113–16,

123–30.) Even given Talenfeld's signature on the Short Form Operating Agreement in March 2018, the Court finds that Plaintiff has pleaded the elements of fraud.

45. The pleading also satisfies Rule 9. With respect to affirmative misrepresentations, Plaintiff alleges that, throughout the summer 2017, Propheter represented to Plaintiff that "Criticality" would own 50% of TCP. (Compl. ¶¶ 41–42). It alleges that, throughout 2017, Propheter deliberately referred to "Criticality" in his communications with Plaintiff to deceive Plaintiff into contributing resources to Criticality North Carolina while believing it was benefitting Criticality Arizona. (Compl. ¶¶ 101, 104, 124–26.) Plaintiff alleges that during this same period Propheter appeared in photos and posts on social media using the trademark and logo of Criticality Arizona without revealing that the structure of the deal had changed to involve Criticality North Carolina, a second LLC that Propheter organized in June 2017 without telling Plaintiff. (Compl. ¶¶ 43–46.) Specially, Plaintiff alleges that Propheter "deliberately did not clarify" and "repeatedly referred to 'Criticality' in social media posts, without any designation as to the North Carolina entity or the Arizona entity, "all the while deliberately creating confusion between the two entities." (Compl. ¶¶ 47, 125–26, Ex. H.)

46. Thus, Plaintiff has identified particular instances of misrepresentation. He has identified when the statements were made,[10] where they were made, by whom they were made, the content of the statements, and the intended results.

---

[10] The Court notes that Plaintiff's allegations regarding when misrepresentations were made is thin in places but finds that it minimally meets the Rule 9 standard and may proceed to discovery.

47. But the Complaint does not stop there. In addition to other facts that Propheter allegedly did not disclose, Plaintiff also alleges that Propheter failed to correct the investor update that was sent to him by e-mail on 8 May 2017 reflecting a 50/50 ownership of the joint venture. (Compl. ¶¶ 34–36.) Plaintiff further alleges that on 18 December 2017 and again on 22 April 2020, Propheter sold portions of Criticality North Carolina to third parties in exchange for sizeable amounts but did not disclose the sales to Plaintiff—at least for some period of time—and that Propheter has never provided Plaintiff with information regarding the terms of the sales or distribution of the sales proceeds. (Compl. ¶¶ 52, 54, 65–69, 107.)

48. Finally, Plaintiff alleges that Propheter formed Pocosin Holdings, LLC ("Pocosin") on 27 July 2018 without Plaintiff's knowledge and that Propheter deliberately withheld information regarding Pocosin's ownership interest in TCP, contrary to the agreed plan. (Compl. ¶¶ 61–64.) Thus, Plaintiff complains that Propheter "misrepresented the ownership of TCP to Plaintiff . . . ." (Comp. ¶ 51.)

49. Plaintiff alleges that these tactics, among others, induced Botanisol to continue to allow Propheter to manage the day-to-day business operations and that Propheter ultimately "used his position to materially deviate from the agreed upon terms with Thar, without disclosing such terms to Plaintiff, to Plaintiff's detriment, by diluting Plaintiff's ownership in the ultimate operating entity." (Compl. ¶ 128.)

50. Notably, "fraudulent concealment or fraud by omission is, by its very nature, difficult to plead with particularity." *Lawrence*, 2007 NCBC LEXIS 20, at *9

(quoting *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 195 (M.D.N.C. 1997)) (quotation marks omitted). Plaintiffs must plead:

> (1) the relationship [between the plaintiff and defendant] giving rise to the duty to speak; (2) the event or events triggering the duty to speak and/or the general time period over which the relationship arose and the fraudulent conduct occurred; (3) the general content of the information that was withheld and the reason for its materiality; (4) the identity of those under a duty who failed to make such disclosures; (5) what [the defendant] gained by withholding information; (6) why plaintiff's reliance on the omission was both reasonable and detrimental; and (7) the damages proximately flowing from such reliance.

*Id.* (citations omitted).

51.     Although a duty to disclose may arise when "a fiduciary relationship exists between the parties to the transaction," a duty to disclose may also arise when "a party has taken affirmative steps to conceal material facts from the other," or when "one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence." *Herrera v. Charlotte Sch. of Law, LLC,* 2018 NCBC LEXIS 35, at *38–39 (N.C. Super. Ct. Apr. 20, 2018) (quoting *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696 (2009)) (citations and quotation marks omitted). Furthermore, under some circumstances, there may be no duty to speak, but nevertheless full and fair disclosure is required because the party has chosen to speak. *Shaver v. N.C. Monroe Constr. Co.*, 63 N.C. App. 605, 614 (1983).

52.     Plaintiff has pleaded fraudulent concealment with sufficient particularity. Botanisol has alleged that there was a relationship between Plaintiff and Propheter that gave rise to the duty to speak. While it was not a fiduciary

relationship, Botanisol alleges that Propheter knew that Plaintiff had entrusted him to handle the business operations, including the negotiations with Thar. (Compl. ¶ 37.) Botanisol further alleges that it depended on Propheter to keep it informed but that Propheter took steps to conceal material facts from it. Plaintiff claims, for example, that Propheter "knew that . . . Plaintiff expected to own a 50% interest in [TCP]," (Compl. ¶ 102), and that Propheter also knew that this expected ownership interest had been diluted. (Compl. ¶ 107.) Furthermore, Plaintiff alleges that Propheter knew that Plaintiff was unaware of the change in ownership structure— at least until 8 March 2018—and that he could not discover the truth through the exercise of reasonable diligence. (Compl. ¶¶ 109–10). On these facts, Plaintiff had a duty to speak and allegedly did not.

53. For these reasons, Propheter's Motion to Dismiss is **DENIED** with respect to Plaintiff's Fourth and Sixth Claims for Relief.

F. Negligent Misrepresentation Claim Against Propheter and Mayer

54. "It has long been held in North Carolina that 'the tort of negligent misrepresentation occurs when (1) a party justifiably relies (2) to his detriment (3) on information prepared without reasonable care (4) by one who owed the relying party a duty of care.' " *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 532 (2000) (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206 (1988)).

55. Plaintiff alleges that both Propheter and Mayer had a duty to exercise reasonable care in communicating information to Plaintiff about Criticality Arizona

and Criticality Arizona's ownership interest in TCP because Plaintiff was relying on them as his source of this information. (Compl. ¶ 118.)

56. For the reasons stated above with respect to the Fourth and Sixth Claims for Relief, Plaintiff's claim against Propheter survives at this early stage and may proceed to discovery.

57. As for Mayer, however, the result is different. Plaintiff contends broadly that "Propheter and Mayer supplied information to the Plaintiff and intended for the Plaintiff rely [sic] on that information," (Compl. ¶ 119); that "Propheter and Mayer made material misrepresentations" or "concealed material facts," (Compl. ¶ 120); and that Propheter and Mayer "failed to exercise reasonable care or competence in obtaining and communicating the false information . . . and concealing material facts," (Compl. ¶ 121). However, these general allegations against Mayer, stated in the conjunctive and without detail, are not pleaded with sufficient particularity with respect to Mayer to satisfy the heightened pleading standard in Rule 9. N.C.G.S. § 1A-1, Rule 9(b).

58. Unlike the myriad of allegations of specific misconduct on the part of Propheter, a close review of the complaint does not reveal a specific allegation of wrongdoing on Mayer's part. In fact, the only details that Plaintiff provides about Mayer at all are that Mayer was Propheter's father-in-law and a North Carolina farmer with access to farmland to grow hemp, (Compl. ¶¶ 4, 15), that Mayer was going to put a processing plant on his land in Hobgood, North Carolina, (Compl. ¶ 15), that Mayer provided start-up capital along with other initial investors, (Compl. ¶ 21),

and that Mayer was a member of Criticality Arizona and received a copy of the business plan detailing the joint venture, (Compl. ¶¶ 27, 31). Nowhere in his pleading does Plaintiff allege any misrepresentation by Mayer, negligently or otherwise, let alone an allegation sufficient to satisfy the heightened Rule 9 standard.[11]

59.    For these reasons, the Court **GRANTS** Mayer's Motion to Dismiss Plaintiff's Fifth Claim for Relief, without prejudice, but **DENIES** Propheter's Motion to Dismiss Plaintiff's Fifth Claim for Relief.

G.    Unfair and Deceptive Trade Practices Claim Against all Defendants

60.    Plaintiff's Unfair and Deceptive Trade Practices ("UDTPA") Claim alleges that "Defendants' actions were unfair, unjust, deceptive, and carried out in bad faith[]" in violation of North Carolina General Statute § 75-1.1.  (Compl. ¶ 136.) Defendants Criticality and Mayer argue that this claim should be dismissed as to each of them because Plaintiff has failed to satisfy the pleading standard in Rule 9(b). (Def. Criticality's Mem. Supp. Mot. Dismiss 13; Def. Mayer's Mem. Supp. Mot. Dismiss 10.)  Furthermore, all of the Defendants assert that Plaintiff's allegations do no satisfy the "in or affecting commerce" element of the statute.  (Def. Propheter's Mem. Supp. Mot. Dismiss 15; Def. Mayer's Mem. Supp. Mot. Dismiss 11; Def. Criticality's Mem. Supp. Mot. Dismiss 15–18.)  The Court agrees in both respects.

---

[11] Oddly, Plaintiff states in its response brief, "[Mayer] received the same information as Plaintiff concerning the structure of the joint venture with Thar."  (Pl's Mem. Opp. Mot. Dismiss 7, ECF No. 22.)  If this is true, then Plaintiff seems to allege that Mayer was likewise duped by Propheter.  Regardless of Plaintiff's intention with respect to this statement, the Complaint fails to allege a claim for negligent misrepresentation as to Mayer.

61.     With respect to the Rule 9(b) standard, because the Chapter 75 claim is premised on deceptive conduct, the heightened pleading standard of Rule 9(b) applies. *See Vitaform, Inc. v. Aeroflow, Inc.*, 2020 NCBC LEXIS 132, at *37 (N.C. Super. Ct. Nov. 4, 2020). Here, the Complaint is devoid of any allegations of deceptive conduct specifically attributable to Criticality North Carolina. Broad assertions of misconduct against a group of defendants will not suffice. *See, e.g., USA Trouser, S.A. de C.V. v. Williams*, 2016 NCBC LEXIS 54, at *42 (N.C. Super. Ct. July 21, 2016), *aff'd*, 258 N.C. App. 192 (2018); *Worley v. Moore*, 2017 NCBC LEXIS 15, at *74 (N.C. Super. Ct. Feb. 28, 2017). The Court has previously addressed the insufficiency of the allegations against Mayer. Thus, Plaintiff's Chapter 75 claim against Criticality North Carolina and Mayer fails on this basis.

62.     There is a second reason the Chapter 75 claim fails, however, and this reason applies to defeat the claim as to all three Defendants. "N.C.G.S. § 75-1.1 declares unlawful '[u]nfair methods of competition in or affecting commerce.'" *Bhatti v. Buckland*, 328 N.C. 240, 243 (1991) (quoting N.C.G.S. § 75-1.1(a)). With the exception of professional services rendered by a learned professional, "commerce" is broadly defined to include "all business activities, however denominated[.]" N.C.G.S. § 75-1.1(b). However, "the [UDTPA] is not intended to apply to all wrongs in a business setting." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 593 (1991). "Put another way, the General Assembly drafted section 75-1.1 to be broad enough 'to regulate a business's regular interactions with other market participants' but not so broad as to capture conduct 'solely related to the internal operations' of a

business." *JS Real Estate Invs. LLC v. Gee Real Estate, LLC,* 2017 NCBC LEXIS 104, at *18 (N.C. Super. Ct. Nov. 9, 2017) (quoting *White v. Thompson,* 364 N.C. 47, 51–52, (2010)).

63. Specifically, "[m]atters of internal corporate management . . . do not affect commerce as defined by Chapter 75 and our Supreme Court." *McKee v. James,* 2014 NCBC LEXIS 74, at *40–41 (N.C. Super. Ct. Dec. 31, 2014) (quoting *Wilson v. Blue Ridge Elec. Membership Corp.,* 157 N.C. App. 355, 358 (2003); *see Dodge v. Appalachian Energy, LLC*, 2021 NCBC LEXIS 52, at *38 (N.C. Super. Ct. May 27, 2021) (dismissing a UDTPA claim as an intracompany dispute where the complaint alleged that the defendants "breached the operating agreement, concealed company information, misused company assets, and wrongfully increased their interests at the expense of other members"); *JS Real Est. Invs. LLC*, 2017 NCBC LEXIS 104, at *21 (stating that "tangential involvement" of third parties does not "trigger liability" under the UDTPA); *Potts v. KEL, LLC*, 2018 NCBC LEXIS 24, at *15 (N.C. Super. Ct. Mar. 27, 2018) (noting that the involvement of third parties does not "change the fundamental character of the dispute" when the "unfairness of [the] actions, if any, inheres in the relationship between" the co-owners of the business) (citation omitted).

64. The fact that another entity or entities benefitted from the alleged deceptive conduct while Plaintiff did not does not make the dispute one "in and affecting commerce." Although the caselaw with respect to intracompany and intercompany disputes can be confusing, the distinction lies in the nature of the second entity's involvement with the first. If the harm is *to* the second entity or to

the flow of commerce between the first and second entities, commerce is impacted. However, if the second entity is used merely as an instrument to facilitate harm within the first entity, the dispute is intracorporate, and the UDTPA is not implicated. *See, e.g., JS Real Est. Invs. LLC*, 2017 NCBC LEXIS 104, at \*21; *Potts v. KEL, LLC*, 2018 NCBC LEXIS 24, at \*15.

65. In *White*, the plaintiffs alleged that the defendant formed a separate business and diverted work to his new business away from the partnership. *See White*, 364 N.C. at 50. The Court held that the deception "occurred completely within the . . . partnership[,]" and was neither in nor affecting commerce. *Id.* at 54.

66. Here, the allegations are similar to those pleaded in *White*. Plaintiff alleges that Propheter created Criticality NC to divert opportunities away from Criticality Arizona and away from Plaintiff, as the co-member of Criticality Arizona. The Court agrees with Defendants that the focus of the deception was on Criticality Arizona and its members and was not "in or affecting commerce." *See, e.g., JS Real Estate Investments*, 2017 NCBC LEXIS 104, at \*20 ("By its nature, this dispute does not concern the regular interactions of separate market participants.").

67. Finally, to the extent Plaintiff premises the attempted Chapter 75 claim on violations of "federal and state securities laws," (Compl. ¶ 138(d)), the attempt is wrong-headed. *See, e.g., HAJMM,* 328 N.C. at 593–94 (holding that securities transactions are beyond the scope of business activities that qualify as "in or affecting commerce" under the UDTPA).

68. For these reasons, the Court **GRANTS** Defendants' Motions to Dismiss Plaintiff's Eighth Claim for Relief.

H.     Constructive Trust and Accounting Claim Against all Defendants

69. Plaintiff's Seventh Claim for Relief is labeled "Constructive Trust and Accounting" and is asserted against all Defendants. (Compl. ¶¶ 131–34.)

70. A request for a constructive trust is not a "claim" at all but is rather a request for a form of relief. *See LLG-NRMH, LLC v. N. Riverfront Marina & Hotel, LLLP*, 2018 NCBC LEXIS 105, at *14 (N.C. Super. Ct. Oct. 9, 2018) ("[A] constructive trust is not a standalone claim for relief or cause of action.") (citing *Weatherford v. Keenan*, 128 N.C. App. 178, 179 (1997)); *see Flynn v. Pierce*, 2020 NCBC LEXIS 149, at *15 (N.C. Super. Ct. Dec. 22, 2020) (dismissing a claim for constructive trust as a remedy rather than a claim). It remains to be seen whether such relief is appropriate here.

71. It should be noted that fiduciary relationships, "while generally the basis for constructive trust claims, [are] not strictly required." *Variety Wholesalers Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 530 (2012). Even in the absence of such a relationship, a constructive trust may be imposed under other "inequitable" or "unconscientious" circumstances, or other wrongdoing. *Id.* at 531; *Wilson v. Crab Orchard Dev. Co.,* 276 N.C. 198, 211 (1970); *Speight v. Branch Banking & Trust Co.*, 209 N.C. 563 (1936). The common element is "some fraud, breach of duty or other wrongdoing by the holder of the property, or by one under

whom he claims, the holder, himself, not being a bona fide purchaser for value." *Wilson*, 276 N.C. at 212.

72.     There are limitations, however.  "[A] court of equity has jurisdiction to reach the property either in the hands of the original wrong-doer, or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes the property relieved from the trust."  *Keith v. Wallerich*, 201 N.C. App. 550, 555 (2009) (citation omitted).

73.     Plaintiff also requests an accounting "of all funds received by Defendants for the sale of [Criticality Arizona's] assets and ownership interests." (Compl. ¶ 134.)[12]  Like a constructive trust, while not a claim, an accounting is available as a remedy when there is a viable underlying claim for relief.  *See, e.g, Higgins v. Synergy Coverage Sols., LLC,* 2020 NCBC LEXIS 4, at *112–13 (N.C. Super. Ct. Jan. 15, 2020).

74.     Therefore, Defendants' motion to dismiss the Seventh Claim for Relief is GRANTED without prejudice to Plaintiff's ability to seek imposition of a constructive trust, or an accounting, or both, with respect to any surviving claims.

### III.   CONCLUSION

75.     For these reasons, the Defendants' Motions to Dismiss are **GRANTED** in part and **DENIED** in part as follows:

---

[12] Plaintiff does not allege violation of inspection rights under North Carolina General Statute § 57D-3-04(a), nor could it because it has not alleged that it is a member of Criticality North Carolina, and it has not satisfied the statutory prerequisites to such a claim.

a. Criticality LLC's Motion to Dismiss is **GRANTED**, and the action against it is dismissed with prejudice.

b. Mayer's Motion to Dismiss is **GRANTED.** The Second, Third and Eighth Claims for Relief are dismissed with prejudice. The Fifth Claim for Relief is dismissed without prejudice.[13] The Seventh Claim for Relief is dismissed without prejudice to Plaintiff's ability to seek such relief as appropriate.

c. Propheter's Motion to Dismiss is **GRANTED** in part and **DENIED** in part. The First, Second, Third, and Eighth claims for relief are dismissed with prejudice. The Seventh Claim for Relief is dismissed without prejudice to Plaintiff's ability to seek such relief as a remedy for their surviving claims. In all other respects, Propheter's Motion to Dismiss is **DENIED**.

76. Within twenty days from the date of this Order, Plaintiff and Propheter shall jointly file a revised Case Management Report and submit a proposed Amended Case Management Order to the Court.

---

[13] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court." *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013). The Court concludes, in the exercise of its discretion, that dismissal of Plaintiff's Fifth Claim for Relief against Mayer for negligent misrepresentation is without prejudice.

SO ORDERED, this the 18th day of October 2021.


                                     /s/ Julianna Theall Earp
                                     Julianna Theall Earp
                                     Special Superior Court Judge
                                      for Complex Business Cases